UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>            -v.-<br><br>OLADAYO OLADOKUN,<br><br>                                  Defendant. | 20 Cr. 3-1 (KPF)<br><br>**ORDER** |

KATHERINE POLK FAILLA, District Judge:

Defendant Oladayo Oladokun, who is currently housed at the Federal Correctional Institution in Otisville, New York ("FCI Otisville"), has moved for compassionate release, in the form of a reduction in sentence to time served, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). In support, Mr. Oladokun cites changed family circumstances and his own serious medical issues. The Government opposes the motion. As set forth in the remainder of this Order, the Court denies Mr. Oladokun's motion.

## BACKGROUND

### A. Factual Background

#### 1. The Offense Conduct

Both this Court and the Second Circuit have written previously about the charged conspiracy and Mr. Oladokun's role within it, and the Court incorporates those decisions here by reference. *See, e.g., United States* v. *Kukoyi*, 126 F.4th 806, 810 (2d Cir. 2025); *United States* v. *Ogbuokiri*, No. 20 Cr. 3-4 (KPF), 2024 WL 3026559 (S.D.N.Y. June 17, 2024). To paraphrase its prior description of the conspiracy, the Court observes that:

> [f]rom late 2018 through the fall of 2019, [Mr. Oladokun] was part of a sprawling conspiracy to steal and launder millions of dollars using bank accounts opened with fraudulent information. As charged by the Government in Indictment No. 20 Cr. 3 (KPF) (the "Indictment"), the conspiracy had three basic components. *First*, members of the conspiracy opened business bank accounts, typically in the names of corporate entities and typically using fake identification documents and/or personal identifying information of other (real) people. *Second*, members of the conspiracy used those accounts to receive the proceeds of fraudulent schemes, either by depositing stolen or forged checks into the account, or by fraudulently inducing victims to wire money into the accounts. *Third*, members of the conspiracy accessed the fraudulently obtained funds by withdrawing money from the accounts that received the fraudulently obtained funds, or by transferring the ill-gotten gains to other bank accounts and then withdrawing the money from those accounts.

*Ogbuokiri*, 2024 WL 3026559, at *1.

Mr. Oladokun was, by any metric, the leader of the charged conspiracy. Among other roles, Mr. Oladokun opened or oversaw the opening of numerous fraudulent bank accounts; instructed co-conspirators to open bank accounts or to deposit fraudulently obtained checks into those accounts; provided checks for them to deposit; and helped co-conspirators obtain personal identifying information, fake identification documents, and corporate records needed to open fraudulent bank accounts. (Revised Presentence Investigation Report ("PSR" (Dkt. #413)) at ¶¶ 30-84; *see also id.* ¶ 33 ("In furtherance of the bank-fraud and money-laundering conspiracies, OLADOKUN also possessed and exchanged dozens of names and social security numbers belonging to other people and over a dozen fake driver's licenses.")). According to the

2

Probation Office, Mr. Oladokun was responsible for intended losses of approximately $4,178,501 and unrecovered losses of approximately $105,056. (*Id.* ¶ 32).

### 2. The Arrest and the Guilty Plea

Federal arrest warrants were issued for Mr. Oladokun and several co-defendants on November 27, 2019. (PSR ¶ 85). Many of Mr. Oladokun's co-conspirators were arrested or voluntarily surrendered to law enforcement in December 2019 and January 2020. (*Id.* ¶¶ 86-91).[1] On June 5, 2020, Mr. Oladokun was arrested by local authorities in Maryland on unrelated charges and transferred to federal custody. (*Id.* ¶ 93).

Mr. Oladokun advised the Court and the Government of his intent to proceed to trial. As a result, on August 18, 2022, the grand jury returned Superseding Indictment S7 20 Cr. 3 (KPF) (the "S7 Indictment"), which charged Mr. Oladokun with one count of conspiracy to commit bank fraud, in violation

---

[1]   As it happened, not even the arrest of his confederates deterred Mr. Oladokun from continuing to engage in the charged scheme:

> [W]hile preparing for the trial of Mr. Oladokun, the Government learned that Mr. Ogbuokiri had not only communicated with Mr. Oladokun (while the former was on pretrial release and the latter had not yet been arrested), but had in fact exchanged hundreds of messages, during which they exchanged personal identifying information belonging to other people; exchanged photographs of what appear to be fake driver's licenses and photographs used on those fake licenses (fake licenses are sometimes referred to as "faces" in the chats); discussed opening bank accounts, which they often referred to as "houses"; and discussed receiving and depositing checks (each of which they often called a "leaf") and wire transfers. In short, Ogbuokiri continued working with Oladokun while on pretrial release, doing the same thing as before his arrest.

*United States* v. *Ogbuokiri*, No. 20 Cr. 3-4 (KPF), 2024 WL 3026559, at *2-3 (S.D.N.Y. June 17, 2024) (internal citations omitted).

3

of 18 U.S.C. § 1349, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  (Dkt. #384).

The final pretrial conference in the matter took place over two days, September 7 and 8, 2022.  (Minute Entries for September 7 and 8, 2022). During the second day, Mr. Oladokun advised the Court and his counsel of his intention to plead guilty.  (Transcript of September 8, 2022 Conference ("Sept. 8 Tr." (Dkt. #448)) at 39).  The Court took a break to allow Mr. Oladokun to discuss the matter further with his counsel, and to allow the Government to provide the defense with its then-current understanding of the application of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") to the matter.

Later that day, Mr. Oladokun pleaded guilty, without a plea agreement, to Counts One and Two of the S7 Indictment.  (Minute Entry for September 8, 2022).  Pursuant to the suggestion of the Second Circuit in *United States* v. *Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), the Government provided a letter containing its Guidelines analysis.  According to the *Pimentel* Letter, the Government believed that Mr. Oladokun's adjusted offense level under the Guidelines for Counts One and Two was 37, and that his Criminal History Category was V, yielding a Guidelines range of 324 to 405 months' imprisonment.  (PSR ¶ 6). At the conclusion of the plea proceeding, the Court accepted Mr. Oladokun's guilty plea to Counts One and Two.  (Minute Entry for September 8, 2022).

### 3. The PSR and the Sentencing

In advance of sentencing, the United States Probation Office prepared the Presentence Investigation Report ("PSR"), which determined that Mr. Oladokun's offense level under the Guidelines was in fact 35, based upon the following findings:

    i. a base offense level of seven, pursuant to U.S.S.G. § 2B1.1(a)(1);

    ii. an eighteen-level enhancement for an intended loss of $4,178,501, pursuant to U.S.S.G. § 2B1.1(b)(1)(J);

    iii. a two-level enhancement for 10 or more victims, pursuant U.S.S.G. § 2B1.1(b)(2)(A)(i);

    iv. a two-level enhancement for Mr. Oladokun's intentional use of sophisticated means to commit the offense, pursuant to U.S.S.G. § 2B1.1(b)(10)(C);

    v. a two-level enhancement because the offense involved the possession of five or more means of identification that were unlawfully produced from, or obtained by the use of, another means of identification, pursuant to U.S.S.G. § 2B1.1(b)(11)(ii);

    vi. a four-level enhancement because Mr. Oladokun was an organizer or leader of the conspiracy, pursuant to U.S.S.G. § 3B1.1(a);

    vii. a two-level enhancement for money laundering, pursuant to U.S.S.G. § 2S1.1(b)(2)(B); and

    viii. a two-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a).

(PSR ¶¶ 113-123). With an offense level of 35 and a Criminal History Category of V, the Probation Office calculated Mr. Oladokun's advisory Guidelines range

to be 262 to 327 months' imprisonment (*id.* ¶ 205), and recommended a sentence of 180 months' imprisonment (*id.*, Sentencing Recommendation).

Sentencing took place on February 1, 2023. (Transcript of February 1, 2023 Sentencing Proceeding ("Feb. 1 Tr." (Dkt. #441)); Dkt. #428 (written judgment)). The first portion of the sentencing proceeding included a hearing pursuant to *United States* v. *Fatico*, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), to address contested facts, including the applicable loss figure (*i.e.*, whether it should reflect actual or intended loss (Feb. 1 Tr. 4-11, 14-21)), whether certain incidents proffered by the Government involved fraud (*id.* at 11-12), and whether Mr. Oladokun had used sophisticated means in committing the offense (*id.* at 21). The Government presented evidence in support of its positions, including communications extracted from Mr. Oladokun's cell phone. (*See, e.g.*, *id.* at 14-15, 27-41, 43-48). In addition, the Government explained how its proposed intended loss figure was, if anything, conservative, inasmuch as it (i) only ascribed losses from co-conspirators that could be independently tied to Mr. Oladokun; (ii) excluded other fraudulent transactions in which Mr. Oladokun had been engaged that could not be tied to specific losses; and (iii) excluded small-value checks. (*Id.* at 41-42).

The Court then heard from counsel and from Mr. Oladokun concerning sentencing. (Feb. 1 Tr. 59-93). Among other topics covered by defense counsel was an October 2022 incident in which Mr. Oladokun had been severely beaten by another MDC inmate; the inmate had placed a lock in the sock with which he beat Mr. Oladokun for maximum impact. (*Id.* at 71-75, 85-87). Mr.

6

Oladokun suffered injuries to his shoulder and his jaw, requiring surgery to repair the latter. (*Id.* at 73-74). As an additional mitigating factor, defense counsel cited Mr. Oladokun's close relationship with his mother, and her dependence on him for her care. (*Id.* at 75). In his statement to the Court, Mr. Oladokun emphasized that he had objected to the Guidelines calculations because he wished to take responsibility for his own conduct, but not that of other conspirators. (*Id.* at 91-92).

The Court took a break to consider the parties' arguments and then imposed sentence. (Feb. 1 Tr. 93-99). To begin, the Court adopted the Probation Office's Guidelines calculations, which yielded a sentencing range of 262 to 327 months' imprisonment. (*Id.* at 95-96). It then granted a significant downward variance from that range, citing several of the defense's arguments:

> The October 2022 [beating] incident is something that is troubling to me on a number of levels — that it happened; that it wasn't prevented by prison administration or staff. I am worried about a possible delay in treatment, although I myself don't know if that was something — if there was a delay. At the very least it resulted in extremely serious and severe injuries, and those have been foremost in my thoughts this afternoon.
>
> But ultimately, on reflection and after looking at the materials and listening to the parties today, I find that this is the rare occasion where the concerns that I have about deterrence and about rehabilitation and just punishment [are] outweighed by my concerns about incapacitation and about protection of the community.
>
> Mr. Oladokun's adult life has been apparently one criminal endeavor after another. Arrests did not stop him, and there are a number of arrests in this case. Significant jail sentences did not stop him. Supervised release terms did not stop him. And so it was argued to

7

me this afternoon that the assault in October was a turning point. But I cannot credit that completely, because even at the time of Mr. Oladokun's plea and even here today, Mr. Oladokun is unable or unwilling to accept responsibility for the totality of his conduct. He asked me earlier to understand the truths and the mistruths of his case, but the government's evidentiary presentation to me this afternoon did not show me any mistruths.

Mr. Oladokun indicated that he went to trial because he was not — not because he was not accepting responsibility, but because he disagreed with the government's view of the events and, in particular, did not believe he was the gentleman in either the video or the picture at issue. But putting to the side the identity of the person in the picture, there was an extraordinary amount of evidence … which has made clear to me not only that Mr. Oladokun was involved in the conspiracy, but that he was at the apex of the conspirators I have before me. He led, he organized, he managed others. He was, in my estimation, the most critical part and therefore the most culpable part of the defendants in this case.

\*\*\*

I recognize that his guidelines range and his culpability are more than that of the codefendants. He is not similarly situated to them based on the evidence that I have seen. And he has a worse criminal history. I will vary downward because of the conditions of confinement. I will vary downward because of the injury. And I have thought about the sentences imposed on the other defendants, and I have thought about the loss figure, the actual loss figure in this case, but I cannot and I will not go below his next — his prior longest term of imprisonment.

I'm therefore varying downward to a term of 125 months of imprisonment on each of Counts One and Two.

(*Id.* at 96-99). The Court ordered the term of imprisonment to be followed by concurrent terms of supervised release of three years, and also imposed restitution and forfeiture obligations. (*Id.* at 99).

### 4. The Appeal

Judgment was entered as to Mr. Oladokun on February 7, 2023. (Dkt. #428). Mr. Oladokun then filed a notice of appeal on February 10, 2023. (Dkt. #430). In his counseled brief on appeal, Mr. Oladokun challenged several Guidelines enhancements, including those for loss figure, number of victims, and supervisory role; in his *pro se* supplemental brief, Mr. Oladokun further argued that the decision of his defense counsel not to move for a *Franks* hearing amounted to ineffective assistance. *See Kukoyi,* 126 F.4th at 810. On January 24, 2025, the Second Circuit affirmed Mr. Oladokun's conviction and sentence and rejected his ineffectiveness claim. *See id.* at 811-15.

## B. Procedural Background

While his appeal was pending, Mr. Oladokun filed a *pro se* motion for a sentence reduction under 18 U.S.C. § 3582(c)(2), arguing that his Criminal History Category had been calculated incorrectly. (Dkt. #520). Concluding that Mr. Oladokun would benefit from the assistance of counsel, the Court appointed Sidley Austin LLP under the Criminal Justice Act (the "CJA") to assist Mr. Oladokun with his arguments for a sentence reduction. (Dkt. #521).[2] Ultimately, Mr. Oladokun withdrew his request under § 3582(c)(2)

---

[2] The Court pauses to commend the Sidley firm for its excellent work in this case and gives special mention to Sophia Houdaigui, who forcefully argued Mr. Oladokun's case before the Court.

9

(Dkt. #528), and moved instead for compassionate release pursuant to § 3582(c)(1)(A)(i) (Dkt. #535 ("Def. Br."), 554).  Mr. Oladokun proffers two principal bases for his motion:  *First*, Mr. Oladokun cites his role as the primary caregiver for his mother before his incarceration, and argues that he is now the only available and suitable caregiver for her because other family members have moved away and his mother distrusts external (*i.e.*, non-familial) caregivers.  (Def. Br. 5-9).  *Second*, Mr. Oladokun claims that he did not receive proper follow-up care following the initial surgery on his jaw — and, indeed, had not received the second surgery on his jaw despite more than two years having elapsed since the incident.  (*Id.* at 2-3, 9-11).

The Government opposed Mr. Oladokun's motion in its entirety.  (Dkt. #557 ("Gov't Opp.")).  The Court heard oral argument on the motion on August 13, 2025 (Transcript of Proceedings of August 13, 2025 ("Aug. 13 Tr.")), and now issues its decision.

## DISCUSSION

### A.    Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018) (the "FSA), a court may reduce a defendant's sentence upon motion of the Director of the Bureau of Prisons (the "BOP"), or upon motion of the defendant.  A defendant may move under § 3582(c)(1)(A)(i) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of

such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

When considering an application under Section 3582(c)(1)(A)(i), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i); *see generally United States* v. *Kimbell*, No. 21-288, 2021 WL 5441249, at *1 (2d Cir. Nov. 22, 2021) (summary order). The Second Circuit has summarized the standards pursuant to which district courts must evaluate compassionate release applications:

> A court deciding a compassionate release motion can consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it]." *United States* v. *Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). But there are three requirements that must be satisfied before a court can grant such relief. First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting such relief from prison authorities. Specifically, an inmate may ask the sentencing court to consider reducing a sentence only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A); *see also United States* v. *Saladino*, 7 F.4th 120, 124 (2d Cir. 2021) (holding that the government may waive or forfeit the exhaustion requirement). Second, a court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A); *see* [*United States* v. *Jones*, 17 F.4th 371, 374-75 (2d Cir. 2021)]. Section 3553(a), in turn, lists numerous factors a court must review when imposing a sentence. These

11

> include, as most relevant here, "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "the need for the sentence imposed ... to provide the defendant with ... correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). Third, the inmate must demonstrate that his proffered circumstances are indeed "extraordinary and compelling" such that, in light of these § 3553(a) factors, a sentence reduction is justified under § 3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed.

*United States* v. *Keitt*, 21 F.4th 67, 71 (2d Cir. 2021); *accord United States* v. *Rodriguez*, 147 F.4th 217, 222 (2d Cir. 2025); *United States* v. *Halvon*, 26 F.4th 566, 570 (2d Cir. 2022). The district court's discretion includes the power to reduce, as well as to eliminate, the remaining term of a defendant's sentence. *See Brooker*, 976 F.3d at 237.

The United States Sentencing Commission amended the policy statement contained at U.S.S.G. § 1B1.13, effective as of November 1, 2023, to provide guidance as to what constitutes extraordinary and compelling circumstances in defendant-initiated (as distinguish from BOP-initiated) compassionate release requests. This amendment "as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release motion, however initiated." *United States* v. *Lopez*, No. 16 Cr. 317-22 (PAE), 2024 WL 964593, at *2 (S.D.N.Y. Mar. 5, 2024).

As relevant here, courts may consider the medical circumstances of a defendant, including whether the defendant is (i) "suffering from a serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," or (ii) "suffering from a medical condition that requires long-term or specialized medical care" that is not being provided in prison and without which the defendant is at risk of serious health deterioration or death. U.S.S.G. § 1B1.13(b)(1)(B)-(C). The amended policy statement also recognizes that family circumstances may constitute extraordinary and compelling reasons, as, for example, "[t]he incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent." *See id.* § 1B1.13(b)(3)(C).

In addition to the listed factual circumstances, the amended U.S.S.G. § 1B1.13 contains a catch-all provision that allows consideration of "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." U.S.S.G. § 1B1.13(b)(5). Finally, while the amended policy statement confirms that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement," it notes that "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in

13

determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.* § 1B1.13(d).

As suggested by *Keitt*, the "existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court must release the defendant." *United States* v. *Madoff*, 465 F. Supp. 3d 343, 349 (S.D.N.Y. 2020). Even if a court finds that a defendant has established an extraordinary and compelling reason for a reduction in sentence, it still must then consider the Section 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A)(i); *see also Rodriguez*, 147 F.4th at 222 ("If the court determines that the § 3553(a) factors weigh against a sentence reduction, it may deny the motion on that basis alone." (citing *Keitt*, 21 F.4th at 73)). "The burden of showing that the circumstances warrant a sentence reduction is on the defendant." *United States* v. *Fernandez*, 104 F.4th 420, 427 (2d Cir. 2024) (citing *Jones*, 17 F.4th at 375), *cert. granted in part*, No. 24-556, 2025 WL 1496486 (U.S. May 27, 2025).

**B.    Analysis**

The Government does not dispute, for purposes of this motion, that the exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A)(i) has been satisfied.  (*See* Gov't Opp. 7-10 (not raising failure to exhaust)).  The Court thus proceeds to consider whether Mr. Oladokun has identified "extraordinary and compelling reasons" warranting his release and concludes that he has not.

### 1. Mr. Oladokun Has Failed to Present an Extraordinary and Compelling Reason for Compassionate Release

#### a. Mr. Oladokun's Medical Issues

The Court begins in reverse order, considering first Mr. Oladokun's claims regarding the medical treatment he has received in jail and his consequent medical issues. (Def. Br. 1-2, 9-11; *see also* Aug. 13 Tr. 6 (arguing that Mr. Oladokun's medical conditions "substantially diminish the ability of the defendant to provide self care within the environment of the correctional facility")).[3] After reviewing Mr. Oladokun's relevant medical records, the Court does not find that his current medical issues amount to an extraordinary and compelling reason for his release. While Mr. Oladokun has not received the second surgery on his jaw that was initially contemplated, that failure is the product of Mr. Oladokun's own, at-times-strategic decisions, as well as several miscommunications that have now been rectified by the Court.

To review, Mr. Oladokun was seriously injured when he was beaten by a fellow inmate on October 12, 2022; he was housed at Brooklyn Hospital's intensive care unit for several days and received surgery on his fractured jaw on or about October 19, 2022. On October 20, 2022, Mr. Oladokun was discharged from the hospital.

A second surgery was scheduled for February 8, 2023, but Mr. Oladokun refused the procedure, preferring instead to obtain a second opinion from

---

[3] The dates in this section were derived by the Court from the parties' submissions and from BOP medical and psychological records that were submitted to the Court under seal. In some instances, the date is the Court's best approximation.

15

medical personnel at the facility to which he would be designated. Ultimately, Mr. Oladokun was transferred in March 2023 to BOP's Butner complex in North Carolina. While at Butner, Mr. Oladokun had both medical and psychiatric consultations and was placed on a medical hold pending the completion of the second surgery. However, Mr. Oladokun requested time in June 2023 to consider whether to have the surgery, and ultimately declined to have the surgery on January 23, 2024. This time, Mr. Oladokun claimed PTSD arising from the first surgical procedure; however, during the period of his demurral, Mr. Oladokun sought compassionate release from the BOP so that he could arrange for the surgery himself. Thereafter, BOP lifted the medical hold on Mr. Oladokun.

On or about July 25, 2024, Mr. Oladokun renewed his request for surgery. He repeated the request by turning in a sick call for surgery on or about October 15, 2024. However, during a clinic visit on November 23, 2024, Mr. Oladokun was advised by BOP medical staff that because the medical hold had been lifted, he would have to start the process over again. On March 18, 2025, Mr. Oladokun met with Butner dental staff to discuss his prior declinations of surgery; the parties dispute, however, whether Mr. Oladokun also renewed his request for the surgery. Mr. Oladokun was subsequently transferred to FCI Otisville.

At the time of the August 13, 2025 hearing on Mr. Oladokun's motion, the parties were unsure of the status of his request for surgery. (*See, e.g.*, Aug. 13 Tr. 27-28). The Court reached out to BOP's Northeast Regional

16

Counsel to clarify the matter; as of August 19, 2025, Mr. Oladokun had been seen by a dentist at FCI Otisville and had communicated his desire to proceed with the second surgery.

Lest there be any doubt, the Court is disturbed by the fact that the October 2022 incident happened; indeed, the Court's concern about the incident and its aftermath was a substantial reason for the downward variance it imposed. (Feb. 1 Tr. 99). The Court is also concerned about the previous delays in scheduling the second surgery. However, after reviewing the record in this case, the Court finds that the period of delay from February 2023 until July 2024 was entirely the product of Mr. Oladokun's declinations, and, further, that the delay after that was the product of a series of miscommunications between the parties. The crossed signals have been resolved; Mr. Oladokun has been seen by a dentist at FCI Otisville, and BOP has scheduled an initial consultation with an oral surgeon. Accordingly, the Court concludes that Mr. Oladokun's medical issues have not previously qualified, and do not currently qualify, as an extraordinary and compelling reason for relief under U.S.S.G. § 1B1.13.

    **b.**  **Mr. Oladokun's Parental Issues**

Mr. Oladokun's arguments regarding his mother present a closer issue. (*See* Def. Br. 5-9; Aug. 13 Tr. 6-14, 22-23). Of course, the Court is saddened to learn that Ms. Oladokun's medical conditions (which it refrains from listing here) have worsened since sentencing, and that she requires assistance with her activities of daily living. (*See* PSR ¶ 154; Aug. 13 Tr. 10-12). However, the

17

fact remains that Mr. Oladokun has five other siblings living in London and Atlanta, and Ms. Oladokun's dispreference to move her residence (or to obtain assistance from a non-familial home health care aide) does not constitute an extraordinary and compelling reason for compassionate release. (PSR ¶ 156). *See United States* v. *Pilitz*, No. 17 Cr. 53 (JS), 2025 WL 2324218, at *5 (E.D.N.Y. Aug. 12, 2025) (collecting cases where district courts have accepted, and rejected, claims that a defendant is the only available caregiver for a parent); *United States* v. *Sanchez*, No. 01 Cr. 74-2 (PAC), 2023 WL 7103277, at *6 (S.D.N.Y. Oct. 27, 2023) ("While the external commitments of Sanchez's family members might make caretaking difficult, that is 'merely the inevitable circumstances families face when a family member is incarcerated,' not an extraordinary and compelling reason to reduce a sentence." (internal citations omitted)), *aff'd*, No. 23-7777, 2024 WL 4647668 (2d Cir. Nov. 1, 2024) (summary order); *cf. United States* v. *Lisi*, 440 F. Supp. 3d 246, 251-52 (S.D.N.Y. 2020) (finding extraordinary and compelling circumstances where "the Court received evidence from several sources," including from "[the defendant], his mother, and numerous others," indicating that the defendant is "the only available caregiver for his mother," but denying § 3582(c)(1)(A)(i) motion based on analysis of sentencing factors).

What is more, Ms. Oladokun's current claims that she is effectively bedridden (*see* Dkt. #535-1 at ¶ 4) were dealt a severe blow at the August 13, 2025 hearing, when defense counsel admitted that Ms. Oladokun had, during the pendency of this motion, traveled to Nigeria on a multi-week church trip

18

(Aug. 13 Tr. 12-13). Despite defense counsel's best efforts to reconcile the conflicting pieces of evidence regarding Ms. Oladokun's health (*id.* at 21-23), the Court finds that Ms. Oladokun is not as incapacitated as she now professes to be. The Court similarly views with skepticism the statements of her other children that they lack the time or inclination to care for her. (*See, e.g.*, Dkt. #535-4 through 535-7). Accordingly, the Court does not find that Ms. Oladokun's ailments amount to an extraordinary and compelling reason for compassionate release.

### 2.    The Section 3553(a) Factors Counsel Against Compassionate Release

Finally, even if the Court were to find that either or both of Mr. Oladokun's proffered bases for compassionate release were "extraordinary and compelling," it would still deny his motion after considering the factors set forth in 18 U.S.C. § 3553(a). These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the needs "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

Mr. Oladokun is one of the handful of defendants sentenced by this Court for whom the undersigned prioritized incapacitation among the § 3553(a) factors. That is for good reason: Mr. Oladokun's criminal history spans nearly thirty years, and includes fraud, narcotics, and violence offenses. (PSR ¶¶ 125-131). Substantial terms of imprisonment have done nothing to deter Mr.

19

Oladokun from criminal conduct; indeed, even the arrest of his confederates in the instant case did not stop Mr. Oladokun from perpetuating the fraudulent scheme.  More pointedly, despite numerous opportunities to do so in this case, Mr. Oladokun has never offered a full-throated acceptance of responsibility for his conduct or a sincere expression of remorse to his many victims.  The Court was well within its rights to sentence Mr. Oladokun to a term of imprisonment that was double the sentence it actually imposed; however, the Court took into consideration Mr. Oladokun's family circumstances and his serious medical issues in imposing a substantially-below-Guidelines sentence.  For the Court to impose a further reduction in sentence would contravene the Section 3553(a) factors that it strove so carefully to balance at the original sentencing.

## CONCLUSION

For the reasons set forth in this Order, the Court denies Mr. Oladokun's motion for compassionate release.  The Clerk of Court is directed to terminate the motion pending at docket entry 535.

SO ORDERED.

Dated:   September 10, 2025
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge